Court of Appeals for the Fourth Circuit of Montreal tonight and give their attention for the court is now sitting. Godspeed United States and this honorable court. All right. Thank you. Whoever is not arguing first may be seated. Thank you, Mr. Sandberg. And welcome to this video argument of the Fourth Circuit. Judge Harris and I would first very much like to thank Judge Hudson for joining us today and the lawyers for accommodating, being able to accommodate this unusual time. And with that, Mr. Humphreys, you may begin your argument. May it please the court. I stand before you representing the interest of 41 flood victims. Homeowners and business owners whose homes and businesses were flooded on October 4, 2015. Their homes and businesses were flooded as a result of the dam failures on Fort Jackson when the Sims Lake and Lower Legion Lake breached. These flood victims assert that the U.S. government is liable to them under the Federal Tort Claims Act and that the discretionary function exception does not apply. They base their claims on the findings of the government's own investigation into the dam breaches. Most importantly, they base their claims on the findings that the Sims Lake Dam had grossly inadequate  Ordinarily, I'm sorry, Mr. Humphreys, I'm sorry. I should have raised my hand. Ordinarily, we construe that exception pretty strictly since there is a waiver of sovereign immunity there. Why? What's your best argument that we should not do so here? Well, it's based on the Army regulations themselves, Your Honor. Based on the Army regulations themselves, it specifically says... Which Army regulation, I'm sorry, which Army regulation prescribes the course of action that you rely on, that you say the Army should have been required to do here without discretion? Well, first of all, Your Honor, the Army should have... Well, the garrison commander and the installation commander before him should have determined what the appropriate spillway design flow was and then maintained the dam so that it was sufficient to pass that design flow. That is in the regulations. First of all, on Army regulations... Wait a minute. Isn't it discretionary with the commander to get the garrison commander? The garrison commander will make a decision as to who has final decision responsibility as to the spillway design flow. Here, there's no evidence that he ever made any determination other than that it was one-half PMF, which is what was in the emergency action plan of which he was charged knowledge because he was responsible for it. If he didn't make a determination, then the government is also liable because he was required to make a determination, read with the requirement that the dam must be able to pass the SDS away design flow. Shall I continue? Unless Judge Hudson has a follow-up. No, ma'am, I don't. All right. Go ahead, Mr. Humphrey. So, in this instance, what was required is specified... The government found that there was a critical failing because of the inadequate spillway and the inoperable outlet. A critical failure is a statement that the failure of the dam is imminent and requires immediate or emergency remedial action for problem resolution. Major structural, operational, and maintenance deficiencies exist under normal operation. Major repair or rehabilitation is necessary to restore the dam, spillway, or pertinent works to original design or current design standards. What the regulations say is that all dams must be maintained to allow passage of the design flow, flood without major deterioration of dam components, or damaging, corrosive, or undermining action, no loss of stability. The final decision... Mr. Humphrey? I'm sorry, Your Honor. That's all right. You had your head down. Are there factual disputes in particular that you think that the district court should have resolved but didn't resolve that we need to remand for? There is a factual dispute as to what determination, if any, the garrison commander and the installation commander before him determined what the proper SDF should be. The only thing in the record is that it is one-half PMS. If the garrison commander did not make that determination and did not make any determination, then the government should be liable as well. Okay. And then I go back to one of my earlier questions, and I think maybe Judge Hudson's as well. What, again, is the particular rule or regulation or statute that you are relying on that requires the command to have done these things? Correct. If you read the statutory scheme, the regulatory scheme as a whole, they're in the Army regulations. They're interpreted by the Department of the Army pamphlet. Right. Which number? Okay. First of all, they're required to review and validate the size and hazard classification of each dam every two years. That is the primary determinant. I guess what I'm asking you is, can you give me the numbers, the Army regulation numbers that you're reading from? Yes, ma'am. Do you want them in 420, the newest one? Yes. I'll give you them. Okay. 420-1, Section 7-46 is what requires them to review and validate size and hazard classification every two years. But doesn't this put the discretion in the garrison commander as to how he or she should implement that policy? I mean, that's really the core issue here, isn't it? How much discretion do they have? Was this a discretionary function or not? We maintain it's not because we don't have any evidence in the record that they did that. They shall do that. They shall review every two years the size and hazard classification, which is the primary determinant of SDF. They shall, and this is in 7-47C. Judge Harris has a question. Oh, I'm sorry. Sorry, I know this is tricky. So what I'm looking for, as I'm understanding your argument today, it's really focused on the idea that they needed to pick a level and they didn't do that. And I'm trying to find the regulation that says you have to pick the SDF. And I can imagine a regulation that would say you have to choose it and maybe you have to put it out for notice and comment even and let the people in the area know what it is, publicize it. But I just don't see anything like that. Right. Your Honor, we say it's our position that if you read together 7-47C, along with 7-47A, it's required that it shall be the decision of the dam owner, the garrison commander, with respect to the SDF. The dam owner shall also ensure that Army dams will be maintained at or above the minimum conditions of the host state. I'm sorry. And then under 7-47B, all dams must be maintained to allow passage of the SDF. If you don't make a determination of the SDF, there's no way to ensure that the dams are being maintained to allow passage of that SDF. Well, that's not right, is it? I mean, you could have a rain, the garrison commander could say, look, I've looked at this, and it's going to allow a flow that I think is good enough. And there could still be, because I think the SDF, I'm sorry, I can't remember exactly the scale, but I think SDF should be something between X and Y, and all of that will get over this dam. You wouldn't actually have to pick a specific SDF. And that, Your Honor, you do, that goes to the definition of what SDF is, which is a technical term. There is a range that is possible for the SDF, but there's no evidence that the garrison commander ever picked a range. By building a dam, you don't pick the SDF. Although it has design in the term, it's the spillway design flow or flood, that's not what it means. And if you look at page 6 of the government's brief, they missed their definition of what the spillway design, sorry. Judge Harris, I'm sorry, I have to turn my lights on. Go ahead. Never mind. Oh, you were doing that to turn your lights on. Yeah, I'm so sorry, you guys. Sitting in the dark now. Alone in the dark. I'm sorry, Ms. Roe, please go ahead. I'm sorry. What is not a correct definition of SDF is what's on page 6 of the government's brief where they say SDF is the volume of water that a dam is designed to safely pass without ever topping. That's not what SDF is. SDF is a forward-looking number, not a backward-looking number to what the dam was designed to do. And that can be found by looking at the testimony of the Rule 30b-6 expert on behalf of the government and by looking at what he references, which is the RMC report, the Risk Management Center report, on how you determine what the SDF is. And what it is is the required hydraulic outlet capacity of dams. And I'm reading from the Rule 30b-6 testimony on JA 1455-56, which is known as the spillway design flow or inflow design flood. It's determined based on a location-based design flood and several other considerations. Primary among those are the hazard classification, which must be done every two years, and the reservoir storage capacity. So it's clear from the regulations that that has to be determined because they're required to review that every two years, and they must ensure that the dam is capable of passing the SDF. If they make no determination in that regard, then they violated the mandatory prescriptions of the statute. Under the performance standards, this is the... Do you mind if I get a drink of water real quick? Go right ahead. Thank you very much. When you look at what the Department of Army pamphlet implemented when it became effective, it makes it even clearer that it's the responsibility of the Garrison Command. Are pamphlets akin to statutes or rules or regulations? Can we consider pamphlets to be prescriptive? Two things, Your Honor. I think that they can be particular enough where they do prescribe conduct. That's the court held recently in the Sanders. Secondly, I think they lend to understanding what the statutory or the regulatory scheme would be. And why they're in there. And that's where it says that the Garrison Commanders may be held personally liable for the safety of the dams under their authority and must fund projects to correct deficiencies. If funding is not available, they will forward requests up the chain of command with high priority to get funding for the project, and the responsibility will shift to the next level of authority. The pool will not be raised until the safety deficiency is corrected. Outlets will be maintained and controls tested annually. Now in this instance, when it was asked, what does that mean about the Garrison Commander being held personally liable? At the last argument, when we were on the motion dismissed, it was asked, what is that in there for? And counsel of the government said they looked into it and said it was an attempt to get the attention of the people that were responsible for maintaining the dams to give more attention to them than they were being given by pointing out that they're considered the dam owners. And you can find that at JA 1373 to 1374 where there's discussion of that. Here, Garrison Commander Ellerson, in his deposition, he had not ever read regulations pertinent to his conduct and could not tell what an outlet was despite the requirement they be tested annually. And we would just point out, Judge Harris has a question. I'm sorry. I do have a question and just because I see your time is running up and I don't want to let you go. So there's, in the joint appendix, there is some language or at least some record evidence showing that the Army had determined an appropriate level that was within a range. It was between the hundred year flood and the half PMF. And it further concluded that the existing outlet structure was capable of passing the 500 year storm. So it was fine. So is your position that that is not what happened? Or is it your position that even if that happened, the selection of an SDF wasn't specific enough to meet the regulatory requirements? And I'm sorry, I'm looking at page 526. I believe that's from 1983. Is that correct? Yeah. Right. That's from 1983. That's the development where these flood victims live. And again, hazard classification is the primary determinant of SDF. Every bit of record information from that point forward is that it's one half PMF, which would make sense. You would want to, in light of the additional hazard, have a higher SDF. So that's from 1983 before this development occurred, before the change in the hazard classification happened. And also, that's dated information. If you review the additional information from other time periods, it all shows that it was one half PMF. Did that answer your question, Judge Harris? Yes. And Judge Hutchins, do you have any questions right now? Otherwise, Mr. Humphreys' time is up for now. I do not have any further questions. All right. Mr. Humphreys, you have some time on rebuttal. Thank you. Thank you, Your Honor. Thank you. We'll hear from Mr. Sandberg now. Good morning. May it please the Court, Jeff Sandberg for the United States. The plaintiff's submission in this case is that U.S. Army commanders were negligent in failing to redesign and rebuild the dam from its existing 100-year flood design standard to a much more demanding standard called the half PMF. But as this Court and other courts have found, the U.S. Army's flood design major public works projects are exactly the kinds of decisions that Congress sought to protect under the discretionary function exception. And as I think the colloquy with my opposing colleague pointed out, there's not any language in the Army regulations that requires the dam owner to make a specific finding of SDF on any particular schedule. On the contrary, what's your response to the specific regulation he cites as requiring the garrison commander to make a determination, and he says the garrison commander didn't make a determination at all, one way or the other? There are a few regulatory provisions that I think my opposing colleague invokes. With your indulgence, I'll try to march through each of them. The provision 7-2, the provision 7-4-6 in Army Regulation 421 says that the size and hazard classification of each dam shall be reviewed and validated every two years by the garrison commander. That's not a reference to a design flood. That's a reference to deciding whether the dam is small or intermediate or large and what the downstream hazards are. And my opposing colleague is correct that those should be reviewed. But if you look a little bit further down, Section 747C says final decision responsibility on the design flood and risk analysis shall be the decision of the dam owner. That is an express commitment of discretion to the dam owner to decide what design flood to use. And there's simply nothing in the regulations that says if the design flood standard is more advisable than the 100-year flood standard that the Army is required to breach the dam and rebuild. What about 752B that appears to prescribe repair and maintenance at least of the lower level gate? Just a moment, Your Honor. I'm going to flip to that. All right. It's about maintenance of that lower level gate that ended up being inoperable and rusted apparently. That's right. So there are a few points to be made about that. 752B says significant or high hazard dams requiring structural maintenance or repair will be immediately maintained or repaired, breached, or the pool lowered. That language doesn't specify what is to be considered as a structural maintenance that is required. The way that the Army has understood that is if there's some problem with the dam that means that it's not going to perform at its designed standard, then you need to fix that. But here, the dam was designed to a 100-year flood standard. The low-level outlets inoperability didn't affect the ability of the dam to perform at that standard. And so the Army permissibly chose to address critical items on other dams at Fort Jackson before it turned to the repair of the low-level outlet. It's also ultimately beside the point because the finding in this case was that even if the low-level dam was operable, and even if it had been opened, and even if the lake had been completely drained prior to the historic once-in-a-millennium storm, the lake still would have filled, the dam still would have overtopped, and there would have been negligible changes in the level of flooding that was experienced between Sems Lake Dam and the abandoned railroad embankment, which, unfortunately, the Kings Grant neighborhood abuts. Yes, Your Honor? Let me ask you a question. Let's assume, for the sake of discussion, that the garrison commander was negligent here, simple negligence. Is that sufficient to overcome the defense of discretionary function? No. The statute is very clear that the discretionary function exception applies whether or not the discretion involved was abused, and indeed, even if there was a failure to exercise the discretion at all. Another point that I think it's important to make is even if you decided, even if there were something in the record that said, you know, the standard here should have been half PMF rather than 100-year flood, it's largely academic because that's just a general standard. It doesn't prescribe a course of conduct. That's sort of like saying, you know, we're going to have a rule that the error rate for SSA hearings is going to be 5% or below. That doesn't tell judges how to decide, you know, that doesn't tell the Social Security Administration how to decide how it's going to achieve that error rate. I mean, there are so many decisions that still need to be made even once you decide the design standard is half PMF. So ultimately, I think this fight is somewhat academic. This court's prior... Sorry, just if I can go into that question about whether there was a design standard set. So, what is your position on whether the relevant decision makers did identify an appropriate SDF for this dam? Did they specify this 100-year flood thing? The best... The evidence that we do have in the record suggests that the 100-year flood was reaffirmed as the design standard at the time when the Sims Lake Dam was rehabilitated between 2006 and 2008. Unfortunately, there are a lot of documents from that period that weren't able to be located. The Army used an outside contractor called the Clements Group to help in that rehabilitation project, but there are references in the record to the fact that a 100-year design flood had been used at the time of that rehabilitation. I'm sorry, go ahead. I was just looking down to see if I could get you a specific appendix site. Great. Thank you. Page 1265 of the appendix. It's just a very informal document. There's some questions to the contractor, but there's a question about, you know, could you explain again why the 100-year storm was used here? The government's expert report, which is not in the appendix, but it's at document 126-9 of the district court record, reflects that the government's expert concluded that the dam had been designed to a 100-year flood standard, although the calculations in that case said that the dam was performing slightly under that standard, and that was attributable to just different technical assumptions and conditions built into the analysis. It's plaintiff's burden to show that there was a specific regulation or policy mandating selection of an SDF, and selection of an SDF of half PMF, and then further, how you would go about implementing that half PMF design, and there's nothing like that in the record here. On the contrary, the Army regulation says that the final decision responsibility shall be the decision of the dam owner. The plaintiff's argument ultimately is, it's sort of like, you know, this two-lane country highway isn't passing enough cars through. I think you need to redesign it to a four-lane divided highway standard, and you need to sort of render the dam inoperable in the meantime. And there's nothing in the regulations that suggests such a dramatic step. Yes, sir. Is this case distinguishable from Ridge versus United States, where we had sort of a mix of factual dispute with the merits? In other words, are there factual disputes here left unresolved that should go back? There are no factual disputes left unresolved. In the Ridge case, there was a remand because the plaintiff hadn't gotten discovery on whether the nature of any specific mandates on the part of prison officials to search inmates before they were released into the yard. And here, you know, we had two years of discovery, very extensive discovery, on exactly what mandates did or did not exist. And the plaintiffs have failed to carry their burden of showing that there was any specific mandate on the part of Army commanders to meet any particular standard. Your Honor asked about the Army pamphlet before. I would point you to page 1009 of the appendix, which is a general Army regulation that talks about Army regulations and Army pamphlets and other things and says, you know, what is the role of each of these Army documents in the Army's regulatory scheme? And that document says, Army pamphlets do not establish policy. There's a column down the page that says, does this establish Army policy? Yes, no. Pamphlet says no. So, the requirement that's listed or a purported requirement that's listed in the pamphlet is only in fact a requirement if it also appears in an Army regulation to which that pamphlet pertains. So, the, you know,  in the Army pamphlet that plaintiffs are invoking here that say things like, vegetation shall be mowed, seepage shall be constantly monitored, repairs will be made immediately. That language is an exhortation on the part of managing officials to do those things, but it doesn't itself establish Army policy. There's nothing that requires, you know, an official to sit out there and constantly monitor for seepage, for example. If there are no further questions, we would ask that the judgment be affirmed. Can I just have you, I'm sorry, yes, could you just address for me the regulation that says, the one that ties the federal dams to state performance levels? Yes. So that provision speaks to the maintenance standards. In Army Regulation 420-1, Section 747A says, Army dams will be maintained at or above the minimum condition level of the host state. That is a reference to maintenance of the dam. It's not a reference to design of the dam. What the plaintiffs are fighting about here, what they argue makes a difference in this case, is how the dam was designed, how much water was it designed to pass through. And the Army Regulation is quite clear that that design response, sorry. I'm sorry, this is so awkward. So I'm looking at 747 and maybe I'm looking at the different year, but the title or the heading is performance standards. And then it says, Army dams will be maintained at or above the minimum condition levels of host state and as specified herein. So, it sounds like they're talking about performance standards, not repairs. That's right, but it uses the word maintained. But it also uses performance standards. It comes right under a heading that says performance standards. Yeah, if you look at subsection C, which is also part of that, it says, final decision responsibility on the design flood shall be the decision of the dam owner. So you have design addressed in C and A talks about maintenance. Again, though this fight is somewhat academic because even if you think that subsection A says you need to look to state law for design determinants, the relevant state law provision here says that the design standard under state law for a small significant hazard dam is 100 year flood to half PMS and also exceptions can be made to that at the discretion of the relevant state agency. Again, even if state law didn't permit the very design flood that was used here, that still wouldn't prescribe a specific course of action on the part of Army commanders and so the discretionary function exception would still apply. So I think the reliance on that provision of section 747 fails at multiple levels. Judge Harris or Judge Hudson, do you have further questions? No ma'am. Alright, Mr. Sandberg, unless there's anything further, thank you. Alright,    Thank you, Your Honor. The question that I was going to ask was about the subsection A and the subsection B. The design flood is a performance standard. That's what we pointed out where their definition of it on page 6 of their brief is incorrect.  speaking in terms of what the flood, what the dam was designed to do. It's determined on a forward-looking basis based on the design of the dam. All these things that are not policy-driven determination. That's one thing we haven't talked about yet. I want to talk about what is a policy determination and what is a scientific hazard technical determination. That's exactly what SDF is. It's precisely a performance standard as it indicates on the heading. You asked about factual disputes last time. It seems like my opposing counsel has pointed out 1265 is the first time I've heard that they're maintaining that it was a determination that it was a 100-year flood standard. If you look at the document, that's from 2007. If you look at the structure of how these regulations are supposed to be incorporated, they're supposed to validate and reaffirm the size and hazard classification every two years. In the documents we have from the emergency action plan, that's from 2010. Three years after that where it says that it's one-half PMS. And they're charged with notice of that because they're responsible for the EAP. The garrison commander is responsible to review it annually and to exercise it as well. We also have the testimony of Gary Bowling who is the person most knowledgeable about the dams. And he testified that it was one-half PMS. And you can find that in the appendix at 332 and 334 to 35. And then in the RMC report they determined that it was one-half PMS. So in terms of and that can be found in the appendix at 778. The rich case is not oh I'm sorry. I think you were going to what I was going to ask you about which is how if at all is the rich case applicable here? It is applicable your honor. Particularly the finding that discretionary conduct cannot be grounded in a policy decision when that conduct is marked by individual carelessness or laziness. In the case of the RMC report the pat down search was not done well enough. Here you can look in the RMC report and the proof is in the pudding in terms of what all was wrong with this dam at the time that the rain was falling. That is not the exception. What I believe that is talking about is whether it is going to be a policy determination based on social, economic, or political policy. Individual carelessness and laziness cannot qualify as a policy judgment. We would assert that we are trying to remove discretion from the Garrison commander. All of the changes in the regulations made it clear that he is supposed to keep the pool lowered until safety deficiencies are addressed. Garrison commander didn't even know what an outlet was. Yes, your honor. Yes, your honor. I just want to react to your position that the selection of an SDF is not a policy judgment. I will give you a chance to respond to my concern about what I think is fundamental to your case. The regulation says that the selection of the SDF should be based on an evaluation of the relative risks and consequences of flooding under both present and future conditions. Isn't that paradigmatic policy judgment and discretion? No, your honor. I don't think it is at all. When you are talking about policy, it speaks in terms of social, economic, or political policy. There you are talking about a safety standard and evaluation of the risk downstream from what happens if there is a flood. Who lives down there? What is the depth? It is a technical determination. If you look at the back of the EAP, you can see how much water is going to be going downstream and who lives there. That is not a question of economic, political, or social policy. That is a simple risk calculation that involves a technical determination based on the hydrography of the area. I have a follow-up question. In determining the risk here, how do you factor in if at all that this was the case? No meteorologist could probably have forecast the amount of rain that was to be received. Does that have any bearing on this court's issues in determining whether or not it was discretionary on the part of the garrison commander? It doesn't, Your Honor, because it didn't even get to half. It does not have any bearing? It does not have any bearing on what actual rain fell at Fort Jackson with only one-half of one-half PMS. It was only 25% of the probable maximum flood. 13.1 That was 50% of what the dam was supposed to be designed to successfully pass. 50% of it. So to the extent that it has any bearing, it's what the science says and what the dam should have been to pass, which is one-half PMS. All right. I mean, it just this goes back to my question again. It just seems when you have to evaluate relative risks and consequences, I understand you to be saying that that requires first that you specify what those risks are, but then isn't it always inherently a policy and discretionary judgment as to sort of how much risk is appropriate to bear in a given set of circumstances? I think in this instance, Your Honor, it's not. These are determinations usually determined by the U.S. Army Corps of Engineers. You can take the SDF and then decide you're not going to build the dam to comply with it if you didn't have these regulations saying that you had to do that. Right? I mean, the SDF is a scientific determination. You can make an economic decision not to meet it if you don't have these Army regulations saying that you have to, but here the Army regulations say that you have to meet it. It's a performance standard. So you don't have any discretion. Okay. All right. If neither of the other panel members has any questions, any further questions, I'll ask you to wrap up, Mr. Humphreys. Your Honor, we didn't talk about the Berkovitz case, and I think I'm out of time to talk about it, but in that case it basically lays out three scenarios, which I think is a very good scenario, particularly in light of its comments on what actually is a policy determination and what is not. With that, Your Honor, we would simply ask  request reversed to the trial court's judgment and returned the case to the district court for further determination. All right. Thank you, Mr. Humphreys. And now, you know, Mr.  Mr. Humphreys, at this point, if we were all together, this would be the time when we would come down and greet counsel and hopefully we will all be together one day again soon, but for now you'll have to take our thanks from afar for your arguments. And Mr. Humphreys, I think it was you that was out of country when all this started, is that right? That was me, Your Honor. I'm sorry about all that. I'm glad to see that you are hopefully safe and sound back in the States. I am. Thank you very much. Good. And hopefully, Mr. Sandberg, your family and friends are well and we appreciate your arguments and thank you. Have a good day. Thank you very much. This honorable court stands adjourned, sign of die, God save the United States and this honorable court.
judges: Stephanie D. Thacker, Pamela A. Harris, Henry E. Hudson